UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.  5:13-CV-212-TBR-LLK
ELECTRONICALLY FILED

BOBBY MOSS                                                        PLAINTIFF

-vs-

PENNYRILE RURAL ELECTRIC COOPERATIVE              DEFENDANT

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT ON
THE PLEADINGS FOR FAILURE TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED AND RESPONSE TO
MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Bobby Moss, by counsel, would hereby respond to Defendant's
Motion for Judgment on the Pleadings for Failure to State a Claim Upon Which Relief
Can Be Granted and Defendant's Motion for Summary Judgment.

## I.

## STANDARD FOR MOTION TO DISMISS

For purposes of a Motion for Judgment on the pleadings, all well-pleaded
material allegations of the pleadings of the opposing party, "must be taken as true, and
the Motion may be granted only if the moving party is nevertheless clearly entitled to
Judgment." Id (quoting *J.P. Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir.
2007).  A FRCP 12(c) Motion is appropriately granted, "when no material issue fact exist
and the party making the Motion is entitled to Judgment as a matter of law." Id (quoting
*Winget*, 510 Fed.3d at 582).

In *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam), decided two weeks
after *Bell Atlantic Court v. Twombly*, 550 U.S. 544 (2007) (the Supreme Court
affirmed that "federal rule of civil procedure 8(a)(2) requires only "a short and plain

statement of the claim showing that the pleader is entitled to relief" specific facts are not necessary; the statement need only "give the defendant fair notice of what the claim is and the grounds upon which it rests" ***Erickson***, 551 U.S. at 93 (internal quotation marks and ellipsis omitted) (quoting ***Twombly***, 550 U.S. at 555).   In reviewing the Motion for Judgment on the Pleadings pursuant to Rule 12 this Court read(s) that "***Twombly*** and ***Erickson*** decisions in conjunction with one another".   ***Sensations, Inc. v. City of Grand Rapids***, 526 F.3d 291, at 295-296 (6th Cir. 2008).

Defendant did not file a FRCP 12 Motion until after the discovery process was completed. The Defendant could have promptly filed such a Motion upon receipt of the Complaint.   Further, the Defendant could have filed a Motion for More Definite Statement or Motion to Compel Answers to Interrogatories, if it was genuinely believed that it was <u>not</u> put on notice under FRCP 8(a)(2) which requires only "a short and plain statement of the claims showing that the pleader is entitled to relief".  The statement need only "give the defendant fair notice of what the claim is and grounds upon which it rests." ***Erickson***, 551 U.S. at 93.  The Complaint references Plaintiff's EEOC complaint, which was previously received by the Defendant and is attached to this Response as **Appendix Exhibit 1**.  Furthermore the complaint sets forth:

9.   The Plaintiff began his employment with Pennyrile Rural Electric Cooperative at the Russellville Pennyrile warehouse facility on April 30, 1990 as a warehouseman.

10.   During his twenty-one year tenure, he had been written up for disciplinary reasons on only one occasion prior to being diagnosed with a brain tumor.

11.   Moss's treatment by the Defendant drastically changed after he was diagnosed with a non-malignant brain tumor in August 2008.

12.   For medical reasons Plaintiff had to take sick leave from work for approximately three months.   Plaintiff underwent surgery to remove the tumor on October 15, 2008.  He returned to work on November 26, 2008.  On December 26, 2009, while at home he suffered a grand mal seizure.  Plaintiff returned to work on January

4, 2010.  At that time, for medical reasons, the Plaintiff was unable to operate a vehicle for three months following his seizure…

35.   "By its conduct as set forth before, Defendant has engaged in unlawful employment practices in violation of the ADA and the Kentucky Civil Rights Act, KRS 344.010.  These practices included, without limitation, refusing to provide the Plaintiff with reasonable accommodation for his disability, retaliating against him for seeking reasonable accommodations, treating him in a hostile manner, ridiculing and mocking him, and terminating his employment as a result of his disability and/or perceived disability."  Bobby Moss Verified Complaint.

A Motion to Dismiss for Failure to State a Claim is usually disfavored and rarely granted.  *Wright & Miller*, Federal Practice and Procedure: Civil 2d, Section 1357.  For purposes of this Motion to Dismiss pursuant to FRCP 12 the Complaint is construed in the light most favorable to the Plaintiff and its allegations are taken as true.  As set forth below in a Timeline, Bobby Moss, began his employment at Pennyrile in 1990 and was terminated September 16, 2011.  The Plaintiff began to receive write-ups soon after he was diagnosed with a benign brain tumor and underwent surgery on October 15, 2008.  Plaintiff submits that initially it was believed by Eston Glover, CEO of Pennyrile and Michelle Small, Human Resources Director that Moss would be able to attain his Commercial Drivers' License (hereinafter "CDL"); however, he suffered a grand mal seizure on *December 26, 2009*, and was subsequently placed on anti-seizure medication.   From the time he was placed on the anti-seizure medication until his termination, less than two years later, he suffered the following retaliation acts:  March 5, 2010—he was written up and suspended for three days without pay; May 10, 2010—he was suspended for five days without pay; reassigned from the Russellville Warehouse to the Hopkinsville warehouse and then to Cadiz warehouse and then terminated on *September 16, 2011*.

Plaintiff submits that Defendant's motion under FRCP 12 is not well taken but rather this motion should be considered under FRCP 56.

## II.

### STANDARD FOR GRANTING SUMMARY JUDGMENT

In a Motion for Summary Judgment, credibility determinations, weighing of the evidence and drawing of legitimate inferences from facts are jury functions and not those of a Judge.  The evidence of the non-movant needs to be believed and all justifiable inferences are to be drawn in his favor.  ***Morales v. American Honda Motor Company***, 71 F.3d, 531 (6th Cir. 1995).  Summary Judgment is appropriate only if there is no genuine issue or material fact and the moving party is entitled to Judgment as a matter of law.  See ***Celotex Corp. v. Cantrell***, 477 U.S. 317 , 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and FRCP 56(c).  In reviewing a summary Judgment motion the Court must construe the evidence and all inferences to be drawn from it in the light most favorable to the non-moving party.  *Id*.

## III.

### STATEMENT OF FACTS

The particular facts upon which the Plaintiff relies are summarized below.

### BOBBY MOSS TIMELINE

| | |
|---|---|
| **April 30, 1990** | **Moss begins employment at Pennyrile Rural Electric as the Russellville warehouse manager** |
| September 22, 1994 | Owens writes up Moss for spending too much time on phone and he asks him to not agitate other employees |
| May 6, 1996 | Owens told Moss his attitude needed to improve; do not push to make Pennyrile change things—Moss pg. 86 (Moss refused to sign page 93) |
| November 21, 1996 | Tim White's boots disappear; write up because raincoats were left lying around; told by management they needed to put up or tossed (Moss p. 87) |
| October 23-26, 1998 | Write up for inventory management (Moss p. 88-89; 94) |
| December 4, 1998 | Write up for inventory management |

| 2000 | Pennyrile implements Progressive Disciplinary System |
|------|------|
| 2000 | Eston Glover becomes manager |
| 2000 | Pennyrile becomes fully insured by Anthem (Small p. 87) |
| 2002 | Eston Glover becomes CEO |
| 2004 | Pennyrile becomes self insured with a third-party administrator, North America (Small p. 87) |
| March 2004 | Write-up for Moss and Venable; both will make effort to improve relationship |
| 2008 | Pennyrile goes back to Anthem being third-party administrator. Pennyrile has reinsurance coverage. |
| **August 2008** | **Moss diagnosed with brain tumor** |
| **October 15, 2008** | **Moss undergoes surgery to remove benign brain tumor** |
| November 26, 2008 | Moss returns to work.  Work statement Dr. Abram (Small exhibit 9) (**Appendix Exhibit 2**) |
| February 10, 2009 | Moss complains that Mark Wilkins got in his face and cursed him because warehouse was not clean |
| May 15, 2009 | Work statement. "Patient is gradually being taken off of his medicine and is not to operate any machinery until he is completely off of the medicine (Small exhibit 9) (**Appendix Exhibit 3**) |
| June 23, 2009 | Dr. Mathis states he (Moss) will need to be off Dilantin for six months and be seizure free before commercial driving can be considered, which would be after January 2010 (Bybee dep. P. 24) |
| **December 26, 2009** | **Moss suffers grand mal seizure at home; unable to work** |
| December 28, 2009 | Work statement "patient is to remain off work until seen by Dr. Abram on 12/31/09.  He is also not to drive until after his appointment. (Small exhibit 9) |
| December 31, 2009 | Work statement "patient may return to work on January 4, 2010 with seizure precautions." (Small Exhibit 9) (**Appendix Exhibit 4**) |
| **January 4, 2010** | **Returns to work; unable to operate a vehicle or machine for 3 months; (Glover page 47) (Bybee p. 26) Email to Small from Bybee "allegedly CDL not valid" (Exhibit Bybee 1) (Appendix Exhibit 5)** |
| March 3, 2010 | Incident where Moss allegedly reveals information to John Walpole and Stephen Allen regarding what Todd Adler's salary could possible be.  Glover admits in deposition no evidence that it was Adler's name on screen. (Glover page 42) |
| March 5, 2010 | Mark Wilkins takes Moss to Hopkinsville to see Eston Glover and Michelle Small, where Moss is reprimanded for allegedly revealing Adler's work salary.  **Moss written up and suspended 3 days without pay** (signed under protest) Moss page 100-101. |
| March 10, 2010 | Glover memo "Mr. Hopgood agreed with me that we had tried to do the right thing with Bobby, and let him come back to |

| | work on light duty after medical issue limited his ability to perform, and that Bobby was not acting right now…" |
|---|---|
| March 2010 | 90 days after seizure able to drive forklift |
| March 11, 2010 | Moss returns to work; Glover tells Moss he was to stay out of lineman's quarters unless had specific business reason and was not to attend safety meeting unless specifically instructed.  No one allowed in Moss office except Moss. |
| March 17, 2010 | Moss requests a copy of the March 11, 2010 write up.  Left on Moss desk by unknown person |
| April 1, 2010 | Moss would be allowed to drive Tow motor (Small depo p. 52); Medical note "patient has now been seizure free for past three months; he is now able to drive as long as this is the law for the State of Kentucky.  (Small Exhibit 9) (**Appendix Exhibit 6**) |
| April 2, 2010 | Physical; met standard for 2 year medical card, but could not drive commercially for 6 months after seizure |
| April 27, 2010 | Medical card for CDL issued by Dr. Mathis (Moss depo page 15-17) |
| May 2010 | After safety meeting (Moss did not attend) Robin Bybee entered Moss' office to talk to him.  Adler entered uninvited and used Moss' computer. |
| Next day | Moss is told by Mark Wilkins that if Moss drops complaints against Adler—no disciplinary action would be taken against Moss.  Moss shares with Wilkin, White and Walpole that he cannot release the break on the forklift. |
| May 10, 2010 | Glover and Small writes up Moss for complaining about "petty things" and **he is suspended 5 days without pay** Glover mocks Moss regarding forklift break and makes a showing that he could do it.  Moss told Glover he was not as strong as he used to be before the surgery.  **Glover tells Moss if he complains any more he would be terminated.** |
| May 11, 2010 | Moss could not release brake and no one else was at warehouse.  Moss calls Wilkins and Knight to discuss.  Moss finally able to release with his foot. |
| May 12, 2010 | Moss unable to release forklift brake.  Moss asks Justin Behn to help him release it. |
| May 13, 2010 | At quitting time –Moss' vehicle is blocked from leaving by James Dossett and Phillip Adler.  Moss calls Wilkins and reports. |
| July 21, 2010 | Email thread from Bybee to Moss that he is limited to driving a CMV unable to operate any vehicle with a GVWR or combined weight of 10,001 pounds |
| July 28, 2010 | Moss responds to Bybee that his doctor said he could not drive commercially until released from his medication. (Bybee pg. 28) |

| May 19, 2011 | Moss tells Bybee he is off Dilantin and wanted to check on getting a medical card.  He would be taking Levetiracetam anti-seizure medication for the rest of his life. (Bybee p. 30)  Bybee tells Moss that since he is still taking the anti-seizure medication, there is a waiver process he can go through but have to wait two years after seizure (Bybee p 32-33)  Small and Powell aware Moss does not have a valid CDL.  CDL is required for the warehouseman position.  Glover memo "**Michele and I talked about how to handle this issue, and the fact that he was still not released from certain medicines that would allow him to reapply for his CDL license.   The CDL license is a requirement for a warehouseman position, and really impacts the job that Bobby was hired to do.  We had thought that this would be a temporary situation, but are now concerned about the permanent problem not being able to get a CDL!!** (Bybee Exhibit 3) (Glover p. 710)(**Appendix Exhibit 7**) |
| --- | --- |
| May 20, 2011 | Moss assigned to Hopkinsville office.  One hour commute from his home in Russellville; meeting and memo regarding CDL issue and plan to correct it. |
| May 24, 2011 | Glover memo "I reaffirmed to him (Knight) that Bobby should be included in all jobs that did not require a CDL since Bobby does not have one.  **I should note that this is actually a requirement of the job.**" (Powell exhibit 2)(**Appendix Exhibit 8**) |
| May 31, 2011 | Moss contacted Bybee about driving a truck.  Bybee told Moss he could not drive without a CDL. (Bybee 29) |
| July 19, 2011 | Moss' attorney Jay Joines wrote to attorney for Pennyrile asking why Moss was being assigned to Hopkinsville location. (**Appendix Exhibit 9**) |
| Later | **Moss assigned to Cadiz office.**  One and a half hour commute. |
| August 17, 2011 | Moss bitten by spider.  Files workers' compensation claim.  Moss put on light duty. (Small page 80-81)  Glover does not believe he had a spider bite. (Glover p. 101) |
| August 19, 2011 | Knight to Small email "Bobby Moss has told me several times he can't pick up or move heavy things since his surgery…(Bybee 4)(**Appendix Exhibit 10**) |
| September 16, 2011 | Moss confronted regarding threats.  Moss denied threats.  **Moss terminated**.  Glover states it was not predetermined he would be terminated. (Small p. 74) |
| April 27, 2012 | Dr. Mathis issues medical card to Moss. (Bybee 6) |

Plaintiff has prepared this timeline because it demonstrates in a more visual

manner the progression of progressive disciplinary treatment that the Plaintiff

underwent.  The timeline also sets forth the coinciding commentary by CEO Eston Glover that this employee was essentially becoming a problem because he did not have a CDL, and his belief that the anti-seizure medication that Moss was taking would prevent him from ever obtaining a CDL license.

Within the timeline there were numerous notations made by the employer; management; Eston Glover's notations, Michelle Small's notations and Robin Bybee's notations that they <u>believed</u> that Bobby Moss would not be able to re-obtain his CDL license which Eston Glover stated succinctly "I should note that this was actually a requirement of the job" on May 21, 2011.  Glover therefore believed that Bobby Moss would not be able to obtain a CDL and looked for another reason to terminate him which were the fabricated threats that Bobby Moss was making against Eston Glover and the company and in the "petty complaints" which are set forth in Defendant's motions.  Plaintiff relies heavily upon the "temporal proximity" of his long-term employment at Pennyrile, which was largely without serious incident, and certainly without any suspensions without pay or location reassignments, until the Grand Mal seizure. Four factual points are emphasized at this point.

### A.  <u>Glover believed that Moss could not obtain a medical card and therefore could not obtain a Commercial Drivers' License (CDL)</u>

The decisionmaker, Glover believed that Moss could not get a commercial drivers license.  The Plaintiff's case is that the retaliatory and hostile treatment that he received was as a result of this belief that Moss was disabled.  Moss testified "it all started happening really bad on write-ups after my surgery.  People was picking on me, I had to drive from my house to Cadiz to work." (Moss page 119).  Eston Glover testified that in regard to Bobby Moss' need for CDL

"It's his responsibility—if the men need something hauled to them then it is his responsibility to haul it.  Material needs to be picked up in Hopkinsville and delivered back to Hopkinsville, he would typically do that job, as well." Question – you were present for Bobby Moss' deposition where he testified that – it was rare that he needed to use a CDL to – to take something?  Question – do you dispute?—Answer – I disagree. Question – alright.  How often do believe, as of this May 2011 time period that Bobby Moss needed to use his CDL in the course of being a Warehouseman?  Answer—I would suspect weekly.  Question – to do what?  Answer – haul materials.  Question—take materials to where? Answer – either to Hopkinsville, or to Russellville or – not Russellville, Elkton, or to bring material back from those, or to take material to the men in the field.  Question – so?  Answer – especially during storms. Question – and when you are saying to take to Russellville – I mean to take to Elkton or Hopkinsville, you are referring to going to the warehouse? Answer—yes.  Question—is there any record that was kept as to how often before Bobby's seizures he would utilize his CDL? Answer— I—I have no record of that."  (Eston Glover page 73-74).

Others were quite aware that Bobby didn't have his CDL.  Freddie Powell, vice-president of operations, testified that he was aware of this.  (Freddie Powell, page 8). Robin Bybee had told Powell about Moss' condition.

Moss did not normally operate a truck that required a CDL, when Bobby Moss could not operate then they got Jeff White to do it.  For a while Bobby Moss was not allowed to operate any equipment, someone else had to do his job. (Wilkins deposition, page 24).

Robin Bybee communicated to Michelle Small, head of Human Resources and to Freddie Powell, Vice-President of Operations that Bobby Moss did not have a valid CDL. She does not recall ever telling them about the waiver process.  The inference that would be drawn from this is that they were left with the impression that he could not obtain a valid CDL indefinitely, or that he would not qualify for a waiver.  (Small page 35).  The timeline demonstrates numerous meetings where Moss' lack of CDL was a concern of Eston Glover:  May 19, 2011 and May 24, 2011.  Dr. Steven R. Abram, who performed

the surgery on Bobby Moss, provided to Pennyrile work statements.  (See Michelle Small Exhibit 9).  After Moss suffered a grand mal seizure Dr. Abram provided a work statement, "patient may return to work on 4/1/10 with seizure precautions."  On 4/1/10 he issued a statement that said, "patient has now been seizure free for the past three months; he is now able to drive as long as this is the law for the State of Kentucky." Robin Bybee was responsible for determining if Bobby Moss' CDL was valid. (Bybee page 21-22).  She did not speak to Dr. Mathis directly, although she could have.

Eston Glover was clearly under the belief and understanding that because Moss takes seizure medication that he could not get a CDL.  (Eston Glover deposition page 49).  The record bears out and the evidence would be for the Plaintiff that Eston Glover was operating under the assumption that Moss was taking anti-seizure medication, which invalidates a medical card.  (Eston Glover deposition page 51).

The disciplinary actions and relocations were designed to force Moss to resign. At his termination he was asked to resign.  The Defendant's actions were in retribution for Moss' need for accommodation.

Rather, than address the burden and inconvenience of a good faith and straightforward manner – a pretext was invented.[1]

### B.    Pennyrile failed to Accommodate Moss in Good Faith and Forthrightly address Moss' lack of a CDL, his reduced strength and memory issues.

Moss testified that he had had trouble with his memory since surgery.  (Moss page 107).  Moss also testified that Dr. Abram had told him that he might not be as "stout" as he used to be. (Moss page 29).  Moss testified that he had trouble picking up

---

[1] The definition of pretext according to Merriam-Webster dictionary is "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs."

heavy items.  (Moss page 22).  Moss believed that he was disabled in regard to his

reduced strength and his ability to remember what happened. (Moss page 177).  This

happened after his surgery.  It affected his ability to operate the forklift.  Moss testified

that he felt like he wasn't treated as fair as he was after the diagnosis of the brain tumor

and the surgery because he wasn't as strong as he used to be "and they done things that

caused problems to me instead of helping me" such as the forklift, and lifting heavy

materials.  (Moss page 109-110).

      In regard to the forklift, Eston Glover testified "we were in his office and he said
that the men are tightening—'somebody's tightening up the forklift and I can't open it'
and he just – I said, 'I said surely he can get the forklift brake off' and he said, 'I can't.  I
can't do that' and I said, 'well let's just go see' I said, 'nobody knows we are going to
check it, let's see what it looks like', we walked out to the forklift I grabbed the brake
actually, I was standing on the ground, I wasn't even sitting in the seat, and I just
pushed it forward.  Now he told me it happened all the time, that any time he went to
the forklift that the brake was on too tight to open and when I went back to his office my
suggestion to him was that if he couldn't open it use his foot or get a pipe, but I couldn't
– I even tried to tighten it up so tight that I couldn't open it." (Glover page 95).

      Glover testified that he did not know that Bobby's lack of strength was an issue.

(page 61).  He testified that there were accommodations made for Bobby Moss.  There

was for a period of time no forklift driving, no tow motor driving, and no operating

machinery. (page 60).  Michelle Small testified that there were accommodations made

after Bobby Moss' surgery and his inability to drive a tow motor for three months since

it was restricted duty. (Small deposition page 46).  Small testified that she had the

ability to call doctors to ask for his duty restrictions to be clarified. (Small deposition

page 47).  Eston Glover said he was not aware that the forklift brake incident had

embarrassed him until Moss was moved to Hopkinsville and he started talking to it.

(Eston Glover page 98).  Bobby Moss testified that Glover embarrassed him and that

they "were always trying to find a way to get rid of me." (Moss deposition page 49-50).

11

Defendant had an obligation to act in good faith regarding the Plaintiff's need for Accommodation.   This it did not do.  This obligation of good faith is making a reasonable accommodation as briefed in the legal argument portion of this brief.

### C.   Moss' suspensions and relocations were designed to force his resignation.

Moss testified that he believed that the blocking of the gate was intentional.  He did not ask to be moved to Hopkinsville. (page 91).  Moss testified he believes they were "aggravating him" to try to get rid of him. (page 73).  Moss also believed that Glover was trying to intimidate him.  (Moss page 76).

Glover had told Moss that nobody else was allowed in his office and that Moss was to stay out of the lineman's quarters.  (Moss page 58).  Understandably, the other employees found that Moss' behavior was strange because he was following these directions given to him by Eston Glover.

Robin Bybee testified that she did not know that Eston Glover had told Bobby Moss to stay out of the lineman's quarters.  Ali Cotton stated in her written statement that Eston Glover gathered to use against Bobby Moss.

"Eston explained that we need to be careful to speak accurately when conversing with Bobby, to avoid misunderstandings.  He asked what type of interaction we had had with Bobby over the past few years.  I stated that we had not interacted much because he no longer attended safety meetings. He usually greets us when we come in the warehouse and offers us assistance if we need something carried in but otherwise, he pretty much keeps to himself.  I told Eston that Bobby occasionally acts a little strange.  I once found him standing behind an open door, peering through the crack between the door and door facing, I asked him what he was doing and he said nothing, just watching.  I have also seen him sitting in his office in the dark, and watching the activity of the truck bays. I also told Eston that the Russellville men do not speak to Bobby or interact with him when we are there." (**Appendix Exhibit 11**).

Glover had also asked Jeff White, Robin Bybee, and Ali Cotton to write statements for Bobby Moss' file. (Glover deposition page 86).

12

In regard to the spider bite incident that Bobby experienced and his subsequent workers' compensation claim that he made just days before his termination on August 17, 2011, (spider bite)—terminated (September 16, 2011) Glover testified he does not believe that Moss suffered a spider bite. (Eston Glover page 101). Glover was the decision maker regarding Bobby Moss' termination (Eston Glover deposition page 104).

## D. Defendant's allegations of threats made against CEO Glover and corporation were a pretext for Plaintiff's termination and not the actual reason, which was his disability or perceived disability.

Bobby Moss has denied saying he was going to sue the board and get them all removed. (Moss deposition page 176). Instead what the proof would bear out at trial is that Bobby Moss believed that Eston Glover's treatment of him changed after the surgery and that he did not feel like he was being treated fair. Powell said that Bobby Moss had told him several times that Glover was not doing him right but that Moss "never said he was out to get him." (Powell deposition page 20). Michelle Small testified that Plaintiff was terminated for his threats regarding Eston Glover and the board. (Michelle Small page 41). She stated that Bobby Moss denied telling all of these things to anyone at the time of the meeting.

Based upon the above the Plaintiff would submit that the timeline and the facts would portray and support that Bobby Moss was not terminated for complaining about petty things or for threats against Eston Glover or the corporation. That is a pretext. He was terminated because he did not have his CDL, and he had lost strength, and memory and had become a burden to the company, which they wanted to be relieved from. They tried numerous ways to get Moss to resign by the seriousness of write-ups and suspensions without pay. Finally he was transferred from Russellville to Hopkinsville then to Cadiz, and expected to drive those distances after having the health conditions

13

that he had.  At the time of his termination he was asked if he would resign and he indicated that he would not.  The outline of the facts of this case support that the reason for the termination is not what the Defendant claims but rather it was to rid themselves of an employee who Glover believed had become too burdensome.

## LEGAL ARGUMENTS

1.   **The EEOC complaint was timely filed**.

In order that the record would be complete the Plaintiff attaches the cover letter and the original charge of discrimination, which was filed with the EEOC on December 5, 2011, in which the cause of discrimination was alleged to be discrimination on the basis of disability and retaliation.  (See attached **Exhibit 12**).  The Plaintiff did not indicate that it was a continuing action because the Plaintiff was terminated and therefore it was not a continuing action.  To the Plaintiff's knowledge none of these proceedings were ever filed with the State of Kentucky Human Rights Commission.  The EEOC responded back with a perfected charge and attached is additional correspondence dated January 18, 2012, with the EEOC with the perfected charge, which was drafted by the EEOC.  It alleges discrimination on the basis of disability and retaliation.  While the perfected charge does not mention the word "accommodation" it does state that "after I returned to work I was not allowed in the lineman's quarters, not allowed to attend safety and was harassed about my performance regarding the forklift". Further the original charge that was filed with the EEOC while it does not use the word "accommodation" it actually describes the harassment that the Plaintiff alleges because of his inability to release the forklift due to lack of strength.  The Plaintiff filed the lawsuit within 90 days of the issuance of the right to sue.  Therefore the claim is not barred and was timely filed.

Defendant cites the case of ***Jones v. Sumser Retirement Village***, 209 F.3d 851 (6th Cir. 2000).  It should be noted that the complaint alleges a failure to provide reasonable Accommodations.[2]  The cases cited by the Defendant are distinguishable because the Plaintiff explains in his EEOC filings that he was being written up in retaliation for his perceived disability and humiliated and embarrassed for his inability to have as much strength as he had before, one example continually being used was the failure to release the forklift brake.  In ***Jones,*** the charge not only failed to state a lack of accommodation it only specifically alleged termination claim.  In the instant case Moss has alleged retaliation and hostility he suffered while still employed by the Defendant, which escalated into his termination.  Charges filed with the EEOC are liberally construed as to whether administrative remedies have been exhausted as to particular claims.  Moss' EEOC filing described what occurred during the time of his employment and the factual circumstances that he believed were causing retaliation and discrimination.  The Defendant suffered no prejudice based upon the EEOC filing nor inability to defend this action based upon the EEOC filing and this argument is without merit.

2.    **Defendant is not entitled to Dismissal of Plaintiff's Claims of Violation of the ADA and the KCRA.**

The ADA provides in pertinent part that:

"No employer shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of

---

[2] By its conduct as set forth before, Defendant has engaged in unlawful employment practices in violation of the ADA and the Kentucky Civil Rights Act, KRS 344.010.  These practices included, without limitation, refusing to provide the Plaintiff with ***reasonable accommodation*** for his disability, retaliating against him for seeking reasonable accommodations, treating him in a hostile manner, ridiculing and mocking him, and terminating his employment as a result of his disability and/or perceived disability.  (Emphasis supplied)

employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12 112(a).

The Kentucky Civil Right Act states in pertinent part:

"It is an unlawful practice for an employer: (1) to fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because ...a person is a qualified individual with a disability."

The American with Disabilities Act, 42 U.S.C.§12.10(2)(a) defines disability as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (b) a record of such an impairment; *or* (c) being regarded as having such an impairment.

For purposes of paragraph (1)(C):

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

The Plaintiff alleges the disability that he suffered was a lack of strength, a loss of memory and an inability to obtain a CDL which either constituted disability or that his employer considered him to have a disability. The timeline set forth shows that there was substantial attention given by the employer to his lack of a CDL license and the employer believed that Plaintiff would not be able to obtain a CDL. While there is evidence that Bybee explained to Moss that there was a waiver procedure that could

apply to him within two years there is no such evidence that Eston Glover the decision maker was made aware of that, or believed that to be factual.  The record therefore reflects that the employer for a period of two years would have had to accommodate Plaintiff's lack of a CDL if he was to keep his job as a warehouseman.  Defendant's records and memorandum support that they considered Moss' inability to have a CDL license to be a problem because Eston documented May 19, 2011, memo:

> 'Michelle and I talked about how to handle this issue, and the fact that he was still not released from certain medicines that would allow him to apply for his CDL license.  The CDL license is a requirement for a warehouseman position, and really impacts the job that Bobby was hired to do.  We thought this would be a temporary situation, but are now concerned about the permanent problem not being able to get a CDL!!' (Bybee Exhibit 3).

The Plaintiff would submit that the record in this case establishes that there was direct evidence of discrimination, and therefore a prima facie case is set forth.   In the case of **Lewis v. Humboldt Acquisition Corp.,** 681 F.3d 312, at 321 (6th Cir. 2012) the court decided the standard trial courts should use in instructing juries in ADA cases.  The…ADA bars discrimination "because of" an employee's disability, meaning that the law prohibits discrimination that is a "but for" cause of the employer's adverse decision.

Under the ADA "employers are prohibited from discriminating against a qualified individual with a disability because of his or her disability in employment matters such as hiring, advancement, discharge" **Regan v. Faurecia Auto City, Inc.,** 679 F.3rd 475, 479 (6th Cir. 2012).  An "individual with a disability" is an individual "whom, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds [.] "42 U.S.C. § 12111(a).  Both "disability" and "qualified individual" require further definition.   Under the ADA, "disability" means a "physical or mental impairment, which substantially limits one or

more major life activities of an individual.  42 U.S.C. § 12102(1)(a)."  Major life activities include, among others, "walking, lifting" and "bending". 42 U.S.C. § 12102 (2)(a). An individual is "otherwise qualified" for a position when that individual "can't perform the essential functions [,]" or "fundamental job duties" of his position.  ***Johnson v. Cleveland City School District***, 443 F. App.'s 974, 985 (6th Cir. 2011).

The Plaintiff does allege that his lack of strength was not accommodated in good faith.  Properly requesting reasonable accommodation, Plaintiff does not have to use any "magic words [,]" like accommodation, disability, ADA.  ***Smith v. Henderson***, 376 F.3d 529, 535 (6th Cir. 2004).  The Plaintiff was unable to have a CDL because of his seizure condition.  The record supports that the Plaintiff had a disability, because Pennyrile accommodated him by having others drive when a CDL was required.  Accordingly, Defendant cannot now argue it Moss did not have a disability when it accommodated the fact that he did not have a CDL.  There are repeated references in the record as shown by the timeline where Eston Glover was upset at the aspect of having Moss remaining in a job where is supposed to have a CDL, but he in fact does not.  The retaliatory process that the Defendant exercised against Moss was because it did not any longer want to burden or inconvenience itself with a warehouseman who was unable to have a CDL.

Defendant makes many allegations that Plaintiff's co-workers did not like working with him.  The Plaintiff would respond that first of all, that Moss' obligation as a warehouseman was to keep the warehouse clean and orderly.[3]  Lineman would come in when they were out working in the fields or would be dirty and would track dirt in the

---

[3] Pennyrile had a very rule oriented culture.  One example was that those at an office desk had to have a Pennyrile cup.  Not a soda can or plastic cup.  That was an Eston Glover rule.

warehouse and they had conflicting goals and objectives so it not surprising that there was some tension between the two groups of classifications of workers.

Further, Eston Glover, unbeknownst to the other workers, had instructed Moss that he was to remain in his office and not let others come in his office.  Nor, was Moss to attend safety meetings, which further acted to isolate him and make him appear "odd" to his coworkers.  Glover went to the length of gathering statements from coworkers in regard to Moss to support his plan to terminate Moss based upon Moss' conduct.  Mixed up with this is the claim that the Plaintiff did suffer some memory problems after the surgery.  He did need more assistance with issues or activities involving strength and he did not qualify for a CDL.

Pennyrile disciplined Moss and took away his pay for reporting "petty things". However, some of the reports that Moss made to Bybee were safety violations. (Bybee pages 14-17) and (Wilkins 8-9, 29, and 31).

The Plaintiff relies upon "temporal proximity" and what it shows is that Eston Glover' frustration was building against Moss.   His concern regarding Moss' inability to have a CDL "being a permanent problem."  The day after he wrote that Memo on May 19, 2011, Moss was assigned to the Hopkinsville office on May 20, 2011.  That one day certainly showed that a very high level of "temporal proximity" and frustration by Eston Glover and his decision to relocate Moss.  He further makes another note May 24, 2011 "I should note that this is actually a requirement of the job".

On July 19, 2011, Moss' attorney Jay Joines wrote to the attorney for Pennyrile asking why Moss was being assigned to the Hopkinsville location.  Moss having legal representation further infuriated Glover.  This was protected activity.  It was met with further hostility.  Soon thereafter Moss was reassigned to the Cadiz office for further

19

retaliation.  August 19, 2011, Knight to Small email, "Bobby Moss has told me several times that he can't pick up and move heavy things since his surgery." (Bybee Exhibit 4). On August 17, 2011, Moss receives a spider bite.  Glover says he does not believe that Moss had a spider bite. (Glover page 101).  Glover is fuming that Moss reports this spider bite as a workers' compensation claim. (Cotton Exhibit 4).

The Plaintiff does allege that "the threats" that Moss allegedly made against Glover and CEOs are fabrications and did not occur.  What the record demonstrates is that this was an employee who was desperately trying to maintain his employment to such an extent that he was willing to go through the additional driving and only sought legal advice in July 2011.

In the Sixth Circuit, "temporal proximity" may be sufficient where employee's protected activity is immediately followed by an adverse employment action.  *Mickey v. Zeidler Tool and Die Company*, 516 F.3d 516, 525 (6th Cir. 2008); see *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004) "finding that temporal proximity at three months was significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the Plaintiff's] burden as demonstrating a prima facie case"; *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("[T]his circuit has embraced the premise that in certain distinct cases where temporal proximity wherein the protected activity and the adverse employment action is acutely near in time, that close proximity is the indirect evidence such as to commit an inference of retaliation to arise").  Moss sought legal counsel, who questioned the transfer to Hopkinsville.  He also could not have a CDL and could not lift heavy objects while assigned to the Cadiz warehouse.

A court analyzing a "temporal proximity "case must "look at the totality of the circumstances to determine whether a inference of retaliatory motive could be drawn" *Vereek v. Huron Valley School District*, 609 F.3d 392, 401 (6th Cir. 2010). Looking at the totality of the circumstances as evidenced by the timeline this case supports that the discipline, harassment and termination of Moss was as a result of a disability, or that he was regarded as having a disability in violation of his rights under the ADA and KCRA.

Defendant Pennyrile knew that Moss could not have a CDL and it furthermore knew that he needed help in terms of lifting.  The issue of his CDL was known to Human Resources Michelle Small, to Robin Bybee the safety director, to the safety director's assistant Ali Cotton and to CEO Eston Glover.  The issue of strength was known to Eston Glover.  In his roundabout way there was an accommodation provided to Bobby Moss and the actual facts of which prevent Defendant from now arguing that he was not disabled when in fact it did accommodate his disability.  However, part of the legal responsibility for accommodation is that it be made in good faith. The ADA implementing regulations provide that "to determine the appropriate reasonable accommodations, it may be necessary for employer to initiate an informal, interactive process of the employee" *Kievler v. Honda of America Manufacturing, Inc.,* 485 F.3d 862, 868 (6th Cir. 2007), quoting 29 C.F.R. §  1630.2(0)(3).  The purpose of the interactive process "is to identify the precise limitations resulting from the disability if potential reasonable accommodations that could overcome those limitations" Id. Accordingly, the interactive process requires communication and good faith exploration of possible accommodations.  Id. " even though the interactive process is not described in the context of the ADA, the interactive process is mandatory, and both parties have a

duty to participate in good faith." Id. (emphasis added).  "When a party obstructs the process or otherwise fails to participate in good faith, the court should attempt to isolate the cause of the breakdown and then assign responsibility." Id. In unpublished cases the Sixth Circuit has also indicated that an employer only violates the interactive process if the employee can demonstrate if he or she could have been reasonably accommodated but for the employer's lack of good faith." ***Breitfielder v. Leis***, 151 F. App's 379, 386 No. 04-4364 (6th Cir. 2005).

The Plaintiff would therefore submit that his disciplinary suspensions, relocations and termination would not have occurred "but for" his disability.  See ***Lewis v. Humboldt Acquistion Corp., Inc.***, 681 F.3d 312,321 (6th Cir. 2012) (enhanced). Defendant's reasons are pretextural and the Plaintiff has rebutted this by showing the clear contrast between Moss and Defendant's claims as to what occurred.  See ***Hildebrand v. Dollar General Corporation***, (3:11-CV-00554 (M.D. Tenn. 2013). There exists a genuine issue of fact which precludes summary judgment.

The Plaintiff would submit that he received retaliatory treatment because of his disability and was subjected to a hostile working environment because of his disability. While Pennyrile did accommodate his disability, therefore proving that it could, Glover became resentful of this and fabricated this pretextural reason of Moss making threats against the Board and Glover.  Two very different versions of the story – but the temporal proximity and the whole circumstances support that Moss was a victim of discrimination, retaliatory firing and hostility because of his disability.

Based on the above the Plaintiff would submit that there exists an issue of material fact as to whether the Plaintiff's adverse employment action and termination was a result of his disability, or the perception of his disability and whether the

retaliation that he suffered was a violation of the ADA and the Kentucky Civil Rights Act.

Therefore, Defendant's Motion for Summary Judgment should be overruled.

     Dated this the 21st day of February, 2014.

/s/ Pamela C. Bratcher
Pamela C. Bratcher
P.O. Box 130
Bowling Green, Kentucky 42102-0130
Tel:  (270) 783-8311
Fax:  (270) 783-8522
Email:  pamela@pamelabratcher.com

**CERTIFICATE OF SERVICE**

     I hereby certify that on February 21, 2014, I electronically filed the foregoing **Plaintiff's Response To Defendant's Motion For Judgment On The Pleadings For Failure To State A Claim Upon Which Relief Can Be Granted And Response To Motion For Summary Judgment** with the Clerk of the Court by using the CM/ECF system, which will send electronic filing to the following:

Pamela C. Bratcher pamela@pamelabratcher.com
David Boswell  dboswell@boswell-law.com

     _/s/Pamela C. Bratcher_____
     Pamela C. Bratcher, Attorney for Plaintiff